**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **REALOGY HOLDINGS CORP.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.  4:19-CV-01061** |
| **v.** | ) | |
| | ) | **Hon. Lynn Hughes** |
| **SEITA JONGEBLOED,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

**BRIEF IN SUPPORT OF PLAINTIFF REALOGY HOLDINGS CORP.'S**
**MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION**

---

Holland & Knight LLP

Mary Goodrich Nix
Attorney-in-Charge
Texas Bar No. 24002694
Mary.Nix@hklaw.com
Nicholas A. Sarokhanian
Texas Bar No. 24075020
Nicholas.Sarokhanian@hklaw.com
Lauren R. Becker
Texas Bar No. 24106638
Lauren.Becker@hklaw.com
200 Crescent Court, Ste. 1600
Dallas, TX 75201
214-964-9407 – Telephone
214-964-9501 – Facsimile

Jason Huebinger
Texas Bar No. 24065460
1100 Louisiana Street, Ste. 4300
Houston, TX 77002
(713) 244-6873 – Telephone
Jason.Huebinger@hklaw.com

**ATTORNEYS FOR PLAINTIFF**
**REALOGY HOLDINGS CORP.**

# **TABLE OF CONTENTS**

I.    Summary of Motion..................................................................................................... 7

II.   Factual Background ..................................................................................................... 8

   A.   Summary ................................................................................................................ 8

   B.   Realogy and the Real Estate Industry ............................................................. 10

   C.   Compass RE Texas, LLC.................................................................................... 12

   D.   Jongebloed Signs Restrictive Covenant Agreement, Including Non-Compete, Non-Disclosure, Non-Solicitation, and Other Restrictive Covenants ............................... 14

   E.   Jongebloed's Employment With Realogy ........................................................ 17

   F.   Jongebloed's Access to Specific Confidential and Proprietary Information After Signing the RCA.............................................................................................................. 18

   G.   Jongebloed Left Realogy to Work for Compass, in Violation of the RCA ...................... 20

III.  Argument and Authorities........................................................................................ 22

   A.   Federal Procedural Law, and Delaware Substantive Law, Govern the Determination of this Motion. ........................................................................................................... 22

     1.   Courts Apply the Fifth Circuit's Four-Factor Test when Deciding to Issue Preliminary Injunctions. ....................................................................................................... 23

     2.   Delaware Substantive Law Governs the Application of the Fifth Circuit's Test.......... 23

   B.   All Four Factors Weigh in Favor of Granting this Motion. .............................................. 24

     1.   Factor One: A Substantial Likelihood Exists that Realogy will Prevail on the Merits.. 24

     2.   Factor Two: A Substantial Threat Exists that Realogy will Suffer Irreparable Injury if the Court Does Not Issue the Requested Injunction.............................................. 31

     3.   Factor Three: The Threatened Injury to Realogy Outweighs a Potential Injury Posed by the Requested Injunction to Jongebloed. ................................................................ 38

     4.   Factor Four: Granting the Requested Injunction Will Not Disserve the Public Interest. 38

   C.   The Amount of a Bond, if Any, Should be Minimal. ....................................................... 39

IV.   Discovery and Protective Order.............................................................................. 39

V.    Conclusion and Injunctive Relief Sought ............................................................. 40

# TABLE OF AUTHORITIES

**Federal Cases**

*Abbas v. Foreign Policy Grp., LLC*,
　783 F.3d 1328 (D.C. Cir. 2015) ............................................................23

*Barnett v. DynCorp Int'l, L.L.C.*,
　831 F.3d 296 (5th Cir. 2016) ...............................................................24

*Carbone v. Cable News Network*,
　910 F.3d 1345 (11th Cir. 2018) ...........................................................23

*Cardoni v. Prosperity Bank*,
　805 F.3d 573 (5th Cir. 2015) .................................................23, 24, 26

*Cuba v. Pylant*,
　814 F.3d 701 (5th Cir. 2016) ...............................................................23

*Daily Instruments Corp. v. Heidt*,
　998 F. Supp. 2d 553 (S.D. Tex. 2014) .................................................34

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
　710 F.3d 579 (5th Cir. 2013) ...............................................................25

*Gasperini v. Ctr. for Humanities, Inc.*,
　518 U.S. 415 (1996) .............................................................................23

*Guy Carpenter & Co. v. Provenzale*,
　334 F.3d 459 (5th Cir. 2003) ...............................................................23

*Hanna v. Plumer*,
　380 U.S. 460 (1965) .............................................................................23

*Heil Trailer Int'l Co. v. Kula*,
　542 F. App'x 329 (5th Cir. 2013) .........................................................24

*Janvey v. Alguire*,
　647 F.3d 585 (5th Cir. 2011) ...............................................................36

*Kenyon Int'l Emergency Servs., Inc. v. Malcolm*,
　No. CIV.A H-09-3550, 2010 WL 452745 (S.D. Tex. Feb. 8, 2010), *aff'd*, 400
　F. App'x 893 (5th Cir. 2010) .................................................................9

*Los Lobos Renewable Power, LLC v. Americulture, Inc.*,
　885 F.3d 659 (10th Cir.), *cert. denied*, 139 S. Ct. 591, 202 L. Ed. 2d 427
　(2018) ....................................................................................................23

*Merritt Hawkins & Assocs., LLC v. Gresham*,
    79 F. Supp. 3d 625 (N. D. Tex. 2015), *aff'd*, 861 F.3d 143 (5th Cir.)....................................27

*Ocusoft, Inc. v. Walgreen Co.*,
    No. CV H-17-1037, 2017 WL 1838106 (S.D. Tex. May 8, 2017) ...................................36, 38

*Saunders Ventures, Inc. v. Salem & Urban Compass, Inc., et al.*,
    Case 2:15-cv-06925-LDW-ARL (E.D.N.Y. Dec. 6, 2015) .....................................................22

*Solofill, LLC v. Rivera*,
    No. CV H-16-2702, 2017 WL 514589 (S.D. Tex. Feb. 8, 2017) ....................................36, 38

*Traders Int'l, Ltd. v. Scheuermann*,
    Civ.A. No. H-06-1632, 2006 WL 2521336 (S.D. Tex. Aug. 30, 2006) ................................34

*TransPerfect Translations, Inc. v. Leslie*,
    594 F. Supp. 2d 742 (S.D. Tex. 2009) .................................................................................34

*United States v. Emerson*,
    270 F.3d 203 (5th Cir. 2001) ..............................................................................................31

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981).............................................................................................................25

*Valley v. Rapides Parish Sch. Bd.*,
    118 F.3d 1047 (5th Cir. 1997) ............................................................................................24

**Delaware Cases**

*Cantor Fitzgerald, L.P. v. Cantor*,
    724 A.2d 571 (Del. Ch. 1998)..............................................................................................34

*Connelly v. State Farm Mut. Auto. Ins. Co.*,
    135 A.3d 1271 (Del. 2016) ..................................................................................................25

*Copi of Delaware, Inc. v. Kelly*,
    No. CIV.A. 14529, 1996 WL 633302 (Del. Ch. Oct. 25, 1996),
    *aff'd sub nom. Smart Bus. Sys., Inc. v. Copi of Del., Inc.*, 707A. 2d 767 (Del.
    1998) (Del. 1998)................................................................................................................26

*Del. Elevator, Inc. v. Williams*,
    CIV A No. 5596, 2011 WL 1005181 (Del. Ch.), *judgment entered* (Del. Ch.
    2011) ...................................................................................................................................26

*Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*,
    No. Civ.A. 1518-N, 2006 WL 2337592 (Del. Ch. Aug. 4, 2006) ....................................35, 36

*Hough Assocs., Inc. v. Hill*,
   No. Civ.A. 2385-N, 2007 WL 148751 (Del. Ch.), *judgment entered*, (Del. Ch.
   2007). ........................................................................................................32, 33, 36, 39

*Kan-Di-Ki, LLC v. Suer*,
   C.A. No. CV 7937-VCP, 2015 WL 4503210 (Del. Ch. July 22, 2015) ................................25

*Kan. City S. v. Grupo TMM, S.A.*,
   No. Civ. A. 20518-NC, 2003 WL 22659332 (Del. Ch. Nov. 4, 2003) ..................................33

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*,
   68 A.3d 1208 (Del. 2012), *as corrected* (July 12, 2012) ........................................32

*O'Leary v. Telecom Res. Serv., LLC*,
   No. 10C-03-108-JOH, 2011 WL 379300 (Del. Super. Ct. Jan. 14, 2011)............................27

*Research & Trading Corp. v. Pfuhl*,
   CIV. A. 12527, 1992 WL 345465 (Del. Ch. Nov. 18, 1992)...................................................27

*Singh v. Batta Envtl. Assocs., Inc.*,
   No. Civ.A. 19627, 2003 WL 21309115 (Del. Ch. May 21, 2003) ....................................34, 35

*T. Rowe Price Recovery Fund, L.P. v. Rubin*,
   770 A.2d 536 (Del. Ch. 2000)................................................................................................34

*Tristate Courier & Carriage, Inc. v. Berryman*,
   No. C.A. 20574-NC, 2004 WL 835886 (Del. Ch.), *judgment entered* (Del. Ch.
   2004) ...................................................................................................................... *passim*

*True N. Commc'ns Inc. v. Publicis S.A.*,
   711 A.2d 34 (Del. Ch. 1997)..................................................................................................33

*Vitalink Pharmacy Servs., Inc. v. Grancare, Inc.*,
   1997 WL 458494 (Del. Ch. 1997) ..........................................................................................34

**Texas Cases**

*Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*,
   209 S.W.3d 644 (Tex. 2006)...................................................................................................28

*Exxon Mobil Corp. v. Drennen*,
   452 S.W.3d 319 (Tex. 2014)...................................................................................................26

*Peat Marwick Main & Co. v. Haass*,
   818 S.W.2d 381 (Tex. 1991)...................................................................................................27

**Statutes**

Texas Business and Commerce Code chapter 15 ..........................................................25

Texas Citizen Participation Act ...................................................................................23, 24

**Other Authorities**

*Brown Harris Stevens of the Hamptons, LLC v. Urban Compass, Inc., et al.*,
    Index No. 653693-2015 (November 6, 2015) ............................................................22

*Coldwell Banker Residential Brokerage Company v. Nisbet, et al.*,
    Case No. 16CV00087, Superior Court of California, , Santa Barbara County
    (January 11, 2016) ......................................................................................................22

*NRT New York LLC d/b/a/ Citi Habitats v. Urban Compass, Inc.*,
    Index No. 652462-2014 (August 12, 2014) (Oing, J.)...............................................22

*NRT New York LLC d/b/a/ The Corcoran Group v. Urban Compass, et al.*,
    Index no. 650912-2015 (March 24, 2015) (Scarpulla, J.).........................................22

Fed. R. Civ. P. 65 ........................................................................................................23

Fed. R. Civ. P. 26(d)(1)................................................................................................39

Plaintiff Realogy Holdings Corp. ("**Realogy**") files this Brief in Support of its Motion for Preliminary and Permanent Injunction and Brief in Support ("**Motion**"), and would respectfully show the Court as follows:

## I.    Summary of Motion

Realogy is entitled to a preliminary and permanent injunction enjoining Jongebloed from, at a minimum, her clear breaches of her covenant not to compete and her nondisclosure covenant. Realogy can prove all four factors of the Fifth Circuit's test for preliminary injunctions.

Specifically, Realogy can show a substantial likelihood of success on the merits of its breach-of-contract claim because, under Delaware law (the parties' choice-of-law agreement should be enforced because Jongebloed—despite having the burden to do so—cannot prove that it should be ignored), Jongebloed's covenants are enforceable and reasonable, she is in breach of them, and her breaches are causing Realogy ongoing harm. Realogy can also show a substantial threat of irreparable injury because Jongebloed stipulated her breaches would cause such an injury and because courts routinely find irreparable harm in the context of restrictive covenants. Furthermore, the threatened harm to Realogy outweighs any harm to Jongebloed, who can still work for Compass so long as she complies with her restrictive covenants. Lastly, granting the preliminary injunction would serve the public interest because, as this Court noted in a different non-compete case, reasonable restrictive covenants can result in "increased productivity for both parties and their economy."

Moreover, Realogy's request for injunctive relief is timely, especially given: (1) Jongebloed and her new employer's initial promise to abide by her restrictive covenants, (2) their decision to renege, and (3) Jongebloed's pattern of raising baseless, but time-consuming, obstacles, such as her challenge to the parties' choice of Delaware substantive law and her attempt to obtain a dismissal under the Texas Citizens Participation Act (after her initial but meritless motion to

dismiss under Rule 12(b)(6), for which she did not bother filing a reply after receiving Realogy's thorough response).

Realogy is therefore entitled to its requested injunctions, and requests that the Court grant its Motion for the reasons that follow.

## II.     Factual Background

### A.     Summary

From December 2014 to February 2019, Jongebloed was employed by Martha Turner Sotheby's International Realty® ("**Martha Turner**"), an affiliate of Realogy, as a Sales Manager and then as an officer—the Vice President of Sales. Martha Turner is a luxury residential real estate broker in the Houston area, and has built both an upstanding, respected reputation in the community and goodwill among its customers. Among Jongebloed's responsibilities were to develop relationships with Realogy's customers and its sales agents, who Jongebloed would recruit, train, and retain, and who must be capable of serving discriminating clients and handling significant listings of luxury homes. She also was responsible for overseeing, managing, and assisting with 800 to 900 Martha Turner listings. She shared these responsibilities with a small cadre of top executives (Martha Turner's President and three other Vice Presidents), and worked at or had responsibilities for all of Martha Turner's branches in the Houston area.

In the summer of 2018, Realogy wished to grant Jongebloed with restricted stock units of Realogy and provide Jongebloed with additional and new confidential information related to, among other things, the retention and recruitment of top sales agents in the face of new competition from, among other competitors, Compass RE Texas, LLC ("**Compass**"). As a condition of providing both, however, Jongebloed was required to agree to certain, limited restrictive covenants. Jongebloed did so, and was granted restricted stock units.

Following Jongebloed's agreement to her restrictive covenants, Realogy asked Jongebloed and just two other Martha Turner employees to attend an exclusive presentation provided at Realogy's Presidents' Council meeting in Quebec City in August 2018 regarding Realogy's new initiative to recruit and retain top sales agents.

In January 2019, Jongebloed, along with the handful of other top Martha Turner executives, received access to Realogy's newly-developed proprietary database and software, called iProspect ("**iProspect**") and other confidential information related to Realogy's new initiative to recruit and retain top sales agents.

While employed by Realogy, Jongebloed had a habit of taking notes during sensitive management meetings on spiral notebooks. Realogy employees witnessed Jongebloed taking notes in those notebooks during meetings regarding Realogy's new initiative to recruit and retain top sales agents.

Despite her agreeing not to do so, Jongebloed resigned from Realogy shortly thereafter on February 1, 2019 and began working for a direct competitor of Realogy: Compass. Compass started operations in Houston in November 2018, and Jongebloed is serving as its Brokerage Manager in Houston, which is a similar role as to what she had at Martha Turner.

As shown below, Jongebloed is in direct violation of her covenant not to compete, which prevents her, for a duration of just one year, from performing similar services to competitors within 15 miles of a Realogy branch in which Jongebloed worked. For example, Jongebloed's Compass office is just 2.24 miles from one of the Martha Turner branches at which she worked.

Moreover, Jongebloed is in violation of her nondisclosure covenant, and she took her spiral notebooks with her and has refused to return them to Realogy—despite her agreement that they are Realogy's property.

Compass and Jongebloed have admitted as much, and Compass initially placed Jongebloed in a non-working leave of absence as to the Houston market and, to the extent she provided any services to Compass, Realogy was told she would do so outside of the Houston metropolitan area. However, they have recently reversed course and advised that Jongebloed is no longer on leave and instead is acting as Branch Manager and is overseeing the Houston market in the same role and with similar responsibilities as she held with Realogy and Martha Turner. Because Jongebloed has refused to reconsider her decision and to abide by the terms of her restrictive covenants, Realogy has been forced to file this Motion.

### B.      Realogy and the Real Estate Industry

Realogy is the leading and most integrated provider of residential real estate services in the United States. *See* Affidavit of Marilyn Thompson ("**Aff.**"), attached hereto as "**Exhibit A**" and incorporated herein by reference, at ¶ 4. Realogy focuses on recruiting and retaining independent sales agents and empowering them to best serve today's residential real estate market. Realogy delivers its services through its well-known industry brands including Better Homes and Gardens® Real Estate, CENTURY 21®, Climb Real Estate®, Coldwell Banker®, Coldwell Banker Commercial®, Corcoran Group®, ERA®, Sotheby's International Realty® as well as NRT, Cartus®, Title Resource Group, and ZapLabs®, an in-house innovation and technology development lab. *Id.*

Realogy's fully integrated business model includes brokerage, franchising, relocation, mortgage, and title and settlement services. Realogy provides its independent sales agents and managers access to leading technology, best-in-class marketing and learning programs, and support services to help them become more productive and build stronger businesses. *Id.* at ¶ 5.

The Sotheby's International Realty® brand is affiliated with the world-renowned Sotheby's auction house and is one of the largest and most prestigious franchisors of real estate

brokerage services in the world. Sotheby's International Realty® has developed a system for providing brokerage services in the luxury segment of the residential real estate market which is distinguished and highly regarded. *Id.* at ¶ 6.

Realogy and Sotheby's International Realty® have spent countless hours and immeasurable amounts of money and energy developing processes, procedures, and a strong team of employees in order to, among other things, establish, maintain, and grow its agent base and potential agent relationships and goodwill. Realogy has spent extensive amounts of time, money, and energy developing a premier team of real estate agents to meet the needs of its customer and potential customer base. *Id.* at ¶ 7.  Realogy manages the Martha Turner real estate agents—of which there are hundreds—by means of the Martha Turner President and four Vice-Presidents of Sales. Over time, each agent's unique profiles are compiled in a unique and proprietary manner for Realogy's use in maintaining and growing its agent relationships more efficiently and cost-effectively. *Id.* at ¶ 8.

Realogy gathers and maintains confidential and proprietary information which it has shared with Jongebloed and has provided new, unique and valuable confidential information since she agreed to her restrictive covenants, including but not limited to compilations of historical and financial information related to current agents, the identities of prospective agents Realogy is trying to recruit, compilations of current and potential agents' historical and financial information, compilations of known preferences, habits, likes and dislikes of current and prospective agents, requirements of current and prospective agents, information regarding the recruiting process, information about which current agents Realogy is working to retain as well as why and in what way they are working to retain them, information associated with sales and the sales process, and information about Realogy and Martha Turner's business operations. *Id.* at ¶ 9.

The value of Realogy's fully integrated business model, confidential information, and goodwill is substantial because the brand is indisputably among the most famous in the world and is widely known for providing prestigious brokerage services in the luxury segment of real estate. *Id.* at ¶ 10.

Realogy employs a number of measures to protect against the disclosure of its confidential information, such as limiting access to such information only to those employees who have a need to know, providing access on a tiered basis so that the type and amount of information provided to an employee is based on his or her position and role at Realogy, password-protecting its computers and computer programs, requiring employees that access company information on their personal devices to comply with security standards, terminating access to confidential information at the conclusion of employment, maintaining and conducting oversight of employment and information management policies titled *the Realogy Code of Ethics, the Realogy Key Employment Policies, the Realogy Information Management Policy, and the Dual-Use Device Policy*, and requiring its employees to sign confidentiality and nondisclosure agreements and, in some cases, non-solicitation and noncompetition agreements. *See id.* at ¶ 11; *see also* Ex. A, attaching a copy of Realogy's employment and information management policies as "**Exhibit A-1**," which is incorporated herein by reference.

## C.     Compass RE Texas, LLC

Compass is a real estate brokerage firm founded in 2012. *See* Aff. at ¶ 12; *see also* Ex. A, attaching Compass website "About" page, https://www.compass.com/about/ (last visited Mar. 29, 2019), as "**Exhibit A-2**," which is incorporated herein by reference. Compass has expanded into multiple markets across the country since its opening. *Id.*

Compass launched a brokerage office in Houston, Texas, on November 14, 2018. *See* Aff. at ¶ 13*; see also* Ex. A, attaching Houston Business Journal, "Residential tech brokerage launches

in Houston, snags top-selling agents," Nov. 14, 2018, https://www.bizjournals.com/houston/news/ 2018/11/14/residential-tech-brokerage-launches-in-houston.html (last visited Mar. 29, 2019), as "**Exhibit A-3**," which is incorporated herein by reference. It is this new office that Jongebloed now manages. This office is 2.24 miles from the Martha Turner Briar Hollow office. *See* Aff. at ¶ 13; *see also* Ex. A, attaching a map of the distance between the location of Compass's Houston office and the Martha Turner Briar Hollow location as "**Exhibit A-4**," which is incorporated herein by reference.

Compass has stated publicly its intention to triple its agent population and gain 20% of the market share in the top 20 cities (including Houston) in the United States by 2020. *See* Aff. at ¶ 14; *see also* Ex. A, attaching Inman, "Compass reveals plans for massive expansion, futuristic signage," Nov. 7, 2017, https://www.inman.com/2017/11/07/compass-reveals-plans-for-massive-expansion-futuristic-signage/ (last visited Mar. 29, 2019), as "**Exhibit A-5**," which is incorporated herein by reference.

Jongebloed breached her restrictive covenants by becoming employed with Compass in violation of the non-compete provision (as discussed in more detail below). It is the strong belief of Realogy that Jongebloed will be asked, directly or indirectly, to assist Compass in its attempted raid of Martha Turner agents which she cannot do without utilizing confidential information she learned while at Martha Turner—the very information Jongebloed's restrictive covenants are intended to protect. Further, Realogy believes that Jongebloed will be asked to assist, directly or indirectly, with Compass's pursuit of certain of Realogy's prospective agent targets and she will be unable to avoid using the confidential knowledge she acquired. Aff. at ¶ 15.

**D.      Jongebloed Signs Restrictive Covenant Agreement, Including Non-Compete, Non-Disclosure, Non-Solicitation, and Other Restrictive Covenants**

In the summer of 2018, and in connection with the grant of Realogy restricted stock units, Jongebloed was asked to sign a Restricted Stock Unit Agreement ("**RSUA**") and a Restrictive Covenants Agreement ("**RCA**"), which, together with the Restricted Stock Unit Notice of Grant ("**Notice**") and the 2018 Long-Term Incentive Plan ("**Plan**"), comprised one agreement ("**Agreement**"). *See* Ex. A, attaching the RSUA, RCA, Notice, and Plan as "**Exhibit A-6**," "**Exhibit A-7**," "**Exhibit A-8**," and "**Exhibit A-9**," respectively, which are incorporated herein by reference; *see also* Ex. A-6 at § 6.13.

Jongebloed signed the RCA in consideration for, among other things, access to new and different confidential information, access to and the ability to develop relationships with Realogy's agents, customers and employees at Realogy's expense, association with the goodwill of Realogy and Martha Turner developed particularly in the Houston metroplex, the continued employment of Jongebloed by Realogy's affiliate (Martha Turner) and related compensation and benefits, and the right to acquire and own securities of Realogy. *See* Ex. A at ¶ 17.

In the RCA, Jongebloed acknowledged the following:

> Participant acknowledges and agrees that: (i) the business in which the Company and its Affiliates are engaged is intensely competitive and that Participant's employment by the Company has required, and will continue to require, that Participant has access to, and knowledge of, Confidential Information (as defined herein); (ii) the disclosure of any Confidential Information could place the Company at a serious competitive disadvantage and could do serious damage, financial and otherwise, to the business of the Company and its Affiliates; (iii) Participant has been given access to and developed relationships with, customers of the Company and its Affiliates at the time and expense of the Company; (iv) by Participant's training, experience and expertise, Participant's services to the Company are, and will continue to be, extraordinary, special and unique; and (v) Participant has received good and valuable consideration for the restrictive covenants set forth herein, including without limitation, the right to acquire and own securities

of the Company, the continued employment by the Company or any of its Affiliates and the related compensation and benefits and other good and valuable consideration, the sufficiency of which is hereby acknowledged.

Ex. A-7 at Preamble.

Jongebloed agreed not to solicit employees or agents, as follows:

1. <u>Non-Solicitation; Non-Interference; No Hire</u> From the Effective Date through the one (1) year anniversary of the Participant's termination date, Participant shall not, directly or indirectly, on Participant's own behalf or by, through or on behalf of another person, firm, corporation or other entity, in whatever form, solicit or engage in any business that is competitive with the business engaged in by the Company and its Affiliates as of the date of termination of Participant's employment ("Company Business") with a Covered Client or Prospect. As used herein a "Covered Client or Prospect" is a person or entity, including developers, that (i) was a client, customer or tenant of the Company or its Affiliates or prospective client of the Company or its Affiliates within the (24) twenty-four months immediately preceding Participant's termination, and (ii) is a client, customer, tenant or prospect of an office/department that Participant had supervisory responsibilities or duties with respect to, or is a client, customer, tenant, or prospect that Participant possessed or obtained Confidential Information regarding, or is a client, customer, tenant, or prospect that Participant was involved in a transaction with in a supervisory or direct capacity during Participant's employment with Company or its Affiliates. Participant agrees not take away, solicit or divert business of Covered Clients or Prospect from the Company or its Affiliates, interfere in the business relationships between the Company or its Affiliates and a Covered Client or Prospect or assist or attempt to assist any person, firm or entity soliciting or diverting such Covered Client or Prospect from the Effective Date through the one (1) year anniversary of Participant's termination date. Further, from the Effective Date through the one (1) year anniversary of the Participant's termination date, Participant shall not, directly or indirectly, on Participant's own behalf or by, through or on behalf of another person, firm, corporation or other entity, in whatever form, (i) solicit or induce, or attempt to solicit or induce, any employee, independent contractor, sales agent or sales associate of the Company or its Affiliates, who worked in an office/department that Participant managed, oversaw or with whom Participant otherwise worked during Participant's employment, to leave the Company or its Affiliates for any reason whatsoever or that Participant possessed or obtained Confidential Information

regarding; or (ii) hire, solicit to hire, or in any other manner interfere with the business relationship between the Company or its Affiliates and any employee, independent contractor, sales agent or sales associate of the Company or its Affiliates, who worked in an office/department that Participant managed, oversaw, with whom Participant otherwise worked during Participant's employment, or that Participant possessed or obtained Confidential Information regarding. This restriction is limited to those employees, independent contractors, sales agents or sales associates of the Company or its Affiliates who were employed by or associated with the Company or its Affiliates during the 24 months preceding the termination of Participant's employment with the Company or any of its Affiliates.

*Id.* at § 1.

Jongebloed agreed not to compete with Realogy or its affiliate, Martha Turner, as follows:

2.      <u>Non-Competition</u>. From the Effective Date through the one (1) year anniversary of the Participant's termination date, Participant shall not, directly or indirectly, on Participant's own behalf or by, through or on behalf of another person, firm, corporation or other entity, in whatever form, within fifteen (15) miles of any branch with respect to which Participant worked or had responsibilities (including but not limited to those in a temporary or coverage-related capacity) within the twenty-four (24) month period preceding the termination of Participant's employment (the "Territory"), without written permission of the Company in each instance, directly or indirectly: (i) perform services for a commercial or residential real estate brokerage business that are the same as or similar to the services Participant provided to the Company or its Affiliates during the (24) months immediately preceding Participant's termination or that are otherwise likely or probable to result in the use or disclosure of Confidential Information…

*Id.* at § 2.

Jongebloed agreed not to disclose the confidential information of Realogy or its affiliate,

Martha Turner, as follows:

3.      <u>Non-Disclosure; Non-Use of Confidential Information</u>. The Participant shall not disclose or use at any time, either during his or her employment with the Company and its Affiliates or thereafter, any Confidential Information of which Participant is or becomes aware, whether or not such information is developed by him or her, except to the extent that such disclosure or use is directly related to

16

and required by Participant's performance in good faith of duties assigned to Participant by the Company. Participant will take all appropriate steps to safeguard Confidential Information in his or her possession and to protect it against disclosure, misuse, espionage, loss and theft. Participant shall deliver to the Company at the termination of his or her employment with the Company and its Affiliates, or at any time the Company may request, all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) relating to the Confidential Information or the Work Product (as hereinafter defined) of the business of the Company or any of its Affiliates that the Participant may then possess or have under his or her control.

*Id.* at § 3.

### E.    Jongebloed's Employment With Realogy

Jongebloed was employed as Realogy's Vice President of Sales. In that role, Jongebloed had the responsibility to oversee and manage hundreds of Realogy real estate agents that were based in six Houston metropolitan area brokerage offices managed by Martha Turner.  She was on the management team, provided risk management services, recruited agents, worked to retain agents, managed agents, oversaw sales, and assisted with deal closings and negotiations. Importantly, not only did Jongebloed have access to confidential procedures and processes Realogy uses to establish, maintain, and grow its relationships and goodwill, but she was directly responsible for developing many of these. Aff. at ¶ 22.

In addition, as a member of Realogy's management team, Jongebloed had access to additional confidential information regarding Realogy. She was also provided special access to clients, affiliates, employees, and agents and provided financial resources to develop and deepen those relationships on behalf of Realogy and Martha Turner. *Id.* at ¶ 23.

Among other information, Jongebloed was given access to certain valuable and confidential information regarding agents, recruiting, compensation, financial incentives, market analyses, pricing strategies, agent performance, and business plans. The confidential information

included comprehensive historical and financial information and compilations of public and non-public information. Simply put, this information is not available to the public or outside Realogy. Consequently, Realogy is able to use that information to gain a significant economic and competitive advantage over competitors, including Compass. *Id.* at ¶ 24.

F. **Jongebloed's Access to Specific Confidential and Proprietary Information After Signing the RCA**

Jongebloed was given access to specific confidential information after she signed the RCA. *Id.* at ¶ 25.

At the time that Jongebloed signed the RCA, Realogy used a prospective agent recruiting incentive program. By virtue of Jongebloed's heavy involvement in recruiting, Jongebloed was given access to and regularly received and used information that program after she signed the RCA. *Id.* at 26.

In the latter part of 2018, Realogy developed a new initiative to recruit and retain top sales agents, which was officially rolled out in January 2019.  Jongebloed was one of only three Martha Turner employees who was invited to and did attend Realogy's Presidents' Council meeting in Quebec City in August 2018, where the new strategic plan was discussed. Jongebloed was involved in numerous internal discussions from August 2018 through January 2019 regarding various and confidential aspects of the program, including its implementation within Realogy. *Id.* at 27.

Jongebloed was provided access to iProspect, a proprietary software program owned by Realogy which compiled information relating to prospective agents. This information included, among other sensitive data, compilations of information regarding what Realogy has provided or would provide to prospective agents in terms of compensation, financial evaluations of potential agents, and calculations of the impact of agent recruitment on Realogy's or its affiliates' overhead.

*Id.* The iProspect program also compiles information related to Realogy's recruitment incentives programs. *Id.* at 28.

In addition to Jongebloed's access to Realogy's recruitment programs, Jongebloed also received access to and regularly used a Realogy program called MIS.  This program catalogs the proprietary information owned by Realogy that relates to its agents—namely, information regarding Realogy's agents that is only available internally, such as internal evaluations, projections, and other of Realogy's internal measures to evaluate agent performance. Significantly, the manner in which these agents are evaluated and their information is compiled is regularly used by Realogy to make decisions relating to agent hiring, firing, management, and other various aspects of agent employment. *Id.* at ¶ 29.

Part of Jongebloed's management responsibilities also included her participation in Realogy's weekly management meetings that occurred every Monday. The discussions during these meetings included: (1) issues with real estate agents; (2) various Realogy or brand-affiliated programs; (3) real estate agents that Realogy hoped to recruit or was in the process of recruiting; and (4) real estate agents that Realogy wanted to keep with the company, as well as Realogy's efforts to encourage those agents to stay at Realogy. Significantly, from the time that Compass began its Houston operations in November 2018, the participants at these weekly meetings regularly discussed competitive strategies vis-à-vis Compass, and discussed those real estate agents that Realogy knew had been contacted by Compass, whether and why Realogy wanted to keep those agents, and Realogy's strategies for convincing those agents to remain associated with Martha Turner. *Id.* at ¶ 30.

Notably, from the beginning of Jongebloed's employment, Jongebloed used a number of spiral notebooks to take notes during sensitive management meetings. Jongebloed continued her

notetaking practice after she signed the RCA, and fellow members of the management team specifically recall Jongebloed taking notes during the weekly management meetings that occur every Monday at the Briar Hollow, Houston office. *Id.* at ¶ 31.

Upon information and belief, Jongebloed took notes in these notebooks relating to all aspects of her position with Realogy, including notes related to Realogy's confidential and proprietary information to which Jongebloed was given access and which she regularly used. Significantly, Jongebloed retained these notebooks when she terminated her employment with Realogy and, upon information and belief, these notebooks remain in her possession, custody, and control. *Id.* at ¶ 32.

### G.     Jongebloed Left Realogy to Work for Compass, in Violation of the RCA

Jongebloed voluntarily terminated her employment with Realogy on February 1, 2019, which triggered the one-year post-termination period of the non-compete, non-solicitation, and non-interference provisions of the RCA. *Id.* at ¶ 33.

On February 5, 2019, two business days after Jongebloed resigned from Realogy, Realogy sent correspondence to Jongebloed asking her to abide by the terms of the RCA, including a request that she immediately cease working for Compass, cease providing any confidential information to Compass, and abide by the other terms of the RCA. *See* Aff. at ¶ 35; *see also* the February 5, 2019, Cease and Desist Letter from Realogy to Jongebloed, attached to Ex. A as "**Exhibit A-10**," which is incorporated herein.

On February 14, 2019, Jongebloed and Compass agreed to abide by the provisions of the RCA by moving "Jongebloed to either (1) a non-working leave of absence, or (2) projects and/or initiatives which relate to Compass's business interests outside of the Houston metropolitan area." *See* Aff. at ¶ 35; *see also* email correspondence between Timothea Letson, General Counsel-

Litigation & Employment, for Compass and Jamie Zogby, Executive Legal Counsel – Employment Law, for Realogy, attached to Ex. A as "**Exhibit A-11**" and incorporated herein.

On February 21, 2019, Ms. Letson advised Ms. Zogby, "Jongebloed has affirmatively been moved to a non-working leave of absence as it relates to Houston. To the extent Jongebloed is provided (sic.) any service to Compass, those are being provided outside of the Houston metropolitan area." *See id.*

Realogy has recently been advised that Jongebloed is now providing services for Compass throughout the Houston Metropolitan area and refuses to abide by any of the terms of the RCA. *See* Aff. at ¶ 37. Upon information and belief, Jongebloed began working full time for Compass on or sometime after March 18, 2019, at an office which is a mere 2.24 miles away from the Martha Turner office where Jongebloed worked for Realogy. *Id.*; *see also* Ex. A-3. Upon information and belief, Jongebloed holds the same or substantially the same position at Compass and has the same or substantially the same duties as she had at Martha Turner and is doing so in the same territory. Upon information and belief, Realogy believes Jongebloed's position with Compass threatens to actually or inevitably cause Jongebloed to use and disclose Realogy confidential information in order to be successful in that role; and her actions are a violation of the RCA and constitute a threat of use of Realogy's confidential information and a threat of violation of the non-solicitation and non-interference provisions. *Id.*

On information and belief, Compass has adopted a deliberate strategy of fostering rapid expansion and growth by engaging in unfair and unlawful conduct. Despite its relatively short existence, Compass and employees it has hired from other competitors have faced numerous suits based on practices of using competitors' trade secrets and confidential information for Compass' own benefit. For example, in *NRT New York LLC d/b/a/ The Corcoran Group v. Urban Compass,*

*et al.*, Index no. 650912-2015 (March 24, 2015) (Scarpulla, J.), the court issued a temporary restraining order enjoining Compass from using wrongful means to access Corcoran's proprietary systems, and enjoining Corcoran's former employees who joined Compass from enticing employees, agents or sales associates from the employ of Corcoran in Manhattan and Brooklyn. Similarly, in *NRT New York LLC d/b/a/ Citi Habitats v. Urban Compass, Inc.*, Index No. 652462-2014 (August 12, 2014) (Oing, J.), the court issued a temporary restraining order enjoining Compass from accessing CitiHabitat's proprietary, confidential database. Compass and employees it has hired from other competitors have faced similar suits in *Coldwell Banker Residential Brokerage Company v. Nisbet, et al.*, Case No. 16CV00087, Superior Court of California, Santa Barbara County (January 11, 2016); *Brown Harris Stevens of the Hamptons, LLC v. Urban Compass, Inc., et al.*, Index No. 653693-2015 (November 6, 2015) and *Saunders Ventures, Inc. v. Salem & Urban Compass, Inc., et al.*, Case 2:15-cv-06925-LDW-ARL (E.D.N.Y. Dec. 6, 2015). In *Saunders Ventures*, Compass was accused of accessing a competitor's confidential information not only through former employees of the competitor who copied confidential information before their resignations, but also by hacking into the competitor's database even after those employees resigned and joined Compass.

### III.    Argument and Authorities

Because Realogy can prove all four factors of the Fifth Circuit's test for preliminary injunctions, the Court should issue its requested injunction.

### A.    Federal Procedural Law, and Delaware Substantive Law, Govern the Determination of this Motion.

The Court is sitting in diversity, and Realogy has thus far only brought a claim for breach of contract. *See* Compl. at ¶¶ 13, 43-52. "Under the *Erie* doctrine, federal courts sitting in diversity

apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).[1]

### 1. Courts Apply the Fifth Circuit's Four-Factor Test when Deciding to Issue Preliminary Injunctions.

A party seeking a preliminary injunction must prove: (1) it has a substantial likelihood of prevailing on the merits; (2) there is a substantial threat it will suffer irreparable injury if the preliminary injunction is denied; (3) the threatened injury to it outweighs the potential injury posed by the injunction to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest. *See, e.g., Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 464 (5th Cir. 2003); *see also* Fed. R. Civ. P. 65.

### 2. Delaware Substantive Law Governs the Application of the Fifth Circuit's Test.

"Because this is a diversity case, the forum state of Texas provides the law that governs this choice-of-law analysis." *Cardoni v. Prosperity Bank*, 805 F.3d 573, 580 (5th Cir. 2015). Under that law, choice-of-law agreements are, by default, enforceable. *See id.* at 581. Here, Realogy's breach-of-contract claim is based on the parties' written agreement, which expressly provided that Delaware law: "shall govern the interpretation, validity, administration, enforcement and performance of the terms" of their agreement[2] "regardless of the law that might be applied under principles of conflicts of laws." Ex. A-6 at § 6.8.

---

[1] *See also Cuba v. Pylant*, 814 F.3d 701, 718 (5th Cir. 2016) (Graves, J., dissenting) (concluding—under *Erie, Gasperini*, and *Hanna v. Plumer*, 380 U.S. 460 (1965)—that the Texas Citizen Participation Act, relied on by Jongbloed in her second motion to dismiss, is procedural and therefore cannot apply in federal court); *Carbone v. Cable News Network*, 910 F.3d 1345 (11th Cir. 2018) (Pryor, J.) (concluding the same with respect to Georgia's anti-SLAPP statute); *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 673 (10th Cir.), *cert. denied*, 139 S. Ct. 591, 202 L. Ed. 2d 427 (2018) (same, with respect to New Mexico's anti-SLAPP statute); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328, 1334 (D.C. Cir. 2015) (then-Judge Brett Kavanaugh) (same, with respect to the District of Columbia's anti-SLAPP statute).

[2] Again, the parties' agreement is comprised of the RSUA, the RCA, the Notice, and the Plan. *See* Aff. at ¶ 16.

Because Jongebloed is the party seeking to dishonor her choice-of-law agreement, she has the burden to prove that her choice of Delaware law should be overridden in favor of Texas law. *See, e.g.*, *id.*; *Barnett v. DynCorp Int'l*, 831 F.3d 296, 305 (5th Cir. 2016) (burden on party seeking to dishonor choice-of-law agreement). Jongebloed cannot carry her burden. *See* Pl.'s Resp. to Def.'s Mot. to Dism. [Doc. 12 ] at pp. 6-11 ("**Response**").[3]

Accordingly, the parties' choice of Delaware law should be enforced, and Delaware law governs the application of the Fifth Circuit's four-factor test. *See, e.g.*, *Cardoni*, 805 F.3d at 580 (stating that the choice-of-law issue was the "primary reason the district court concluded Prosperity did not establish a substantial likelihood of prevailing on the noncompetition and nonsolicitation clauses); *Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997) ("To determine the likelihood of success on the merits, we look to the standards provided by the substantive law."); *Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) (". . . state law also governs whether certain injuries qualify as irreparable for the purposes of granting a preliminary injunction.").

### B.    All Four Factors Weigh in Favor of Granting this Motion.

Realogy can prove that all four factors weigh in favor of issuing the requested injunction.

### 1.    Factor One: A Substantial Likelihood Exists that Realogy will Prevail on the Merits.

Because the "purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," and "given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on

---

[3] Notably, despite filing a ***second*** motion to dismiss (based on the Texas Citizen Participation Act), Jongebloed again failed to undertake the full conflict-of-laws analysis, much less carry her burden for dishonoring her choice of Delaware law. Instead, Jongebloed again merely focused on just one of the factors: whether Texas has a materially greater interest than Delaware in the lawsuit. *Compare* Def.'s 1st Mot. to Dism. [Doc. 7] at 2 *with* Def.'s 2d Mot. to Dism. [Doc. 10] at 5,6. Realogy incorporates the Response by reference.

the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "A party thus is not required to prove his case in full at a preliminary-injunction hearing." *Id.* (citation omitted). Instead, to "show a likelihood of success, the plaintiff must present a prima facie case"—"not prove that he is entitled to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013). Indeed, the U.S. Supreme Court has cautioned against "improperly equat[ing] "likelihood of success" with "success" when considering requests for preliminary injunctions. *See Camenisch*, 451 U.S. at 394.

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by defendant; and 3) a resulting damage to plaintiff." *Connelly v. State Farm Mut. Auto. Ins. Co*., 135 A.3d 1271, 1279 n. 28 (Del. 2016) (internal quotations omitted). Additionally, restrictive covenants are enforceable if they meet "general contract law requirements," are "reasonable in scope and duration," advance "a legitimate economic interest of the party enforcing the covenant," and survive a "balance of the equities." *Kan-Di-Ki, LLC v. Suer*, C.A. No. CV 7937-VCP, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015).

### i.    Contractual Obligations Exist.

This element—the existence of contractual obligations—has been met because there is no dispute that Jongebloed promised not to act contrary to the terms of her promises in the RCA: not to compete; not to solicit Realogy's customers; not to solicit Realogy's employees; not to divulge Realogy's Confidential Information (as that term is defined in Section 10(b) of the RCA); and not to disparage Realogy.[4] *See* Ex. A-7 §§ 1, 3, 5. Although Jongebloed argued, in her first motion to

---

[4] Although Jongebloed made no distinction between her separate restrictive covenants, courts recognize differences between non-compete, non-solicitation, and confidentiality or nondisclosure agreements. *See, e.g.*,

dismiss, that the RCA was not supported by sufficient consideration, Realogy's Response explained that the consideration provided to Jongebloed was sufficient under Delaware law.[5] *See* Response at pp. 11-13.

### ii.     Jongebloed's Covenants are Reasonable in Scope and Duration.

Next, while Jongebloed failed to argue otherwise, her covenants are reasonable in scope and duration. "When evaluating the reasonableness of a restrictive covenant, a court must consider how the temporal and geographic restrictions operate together. The two dimensions necessarily interact." *Del. Elevator, Inc. v. Williams*, CIV A No. 5596-VCL, 2011 WL 1005181, at *8 (Del. Ch.), *judgment entered* (Del. Ch. 2011).

Here, the temporal scope of Jongebloed's covenants is reasonable: both her non-competition and non-solicitation covenants last only one year from the date of her resignation.[6] *See* Ex. A-7 at ¶¶ 1-2. Delaware courts generally enforce durations of two or fewer years. *See, e.g.*, *Copi of Delaware, Inc. v. Kelly*, No. CIV.A. 14529, 1996 WL 633302, at *5 (Del. Ch. Oct. 25, 1996), *aff'd sub nom. Smart Bus. Sys., Inc. v. Copi of Del., Inc.*, 707A. 2d 767 (Del. 1998) (Del.

---

*Cardoni*, 805 F.3d at 587-89. All of Jongebloed's restrictive covenants are enforceable, and Realogy reserves the right, if necessary, to seek an injunction related to less than all of the covenants if appropriate under the circumstances. Moreover, and in the alternative, to the extent Texas law applies, chapter 15 of the Texas Business and Commerce Code does not apply to Jongebloed's nondisclosure and confidentiality covenants. *See, e.g.*, *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319 (Tex. 2014).

[5] The consideration was also sufficient under Texas law. *See* Response at pp. 13-19.

[6] Jongebloed also agreed that the duration would extend for the period of time she is in breach of her restrictive covenants. Specifically, she agreed that Realogy "shall not, as a result of the time involved in obtaining [injunctive or other relief], be deprived of the benefit of the full period of the restrictive covenant." The full tolling clause is below:

> If the Participant violates the RCA and the Company brings legal action for injunctive or other relief, the Company shall not, as a result of the time involved in obtaining such relief, be deprived of the benefit of the full period of the restrictive covenant; accordingly, the restrictive covenants contained herein shall be deemed to have the duration specified herein computed from the date the relief is granted but reduced by the time between the period when the restricted period began to run and the date of the first violation of the restrictive covenant by the Participant. *See* Ex. A-7 at § 9.

1998) (two-year restriction reasonable); *Research & Trading Corp. v. Pfuhl*, CIV. A. 12527, 1992 WL 345465, at *11 (Del. Ch. Nov. 18, 1992) (one-year restriction reasonable).[7]

Likewise, the geographic scope of Jongebloed's covenants is reasonable. Geographic reasonableness is determined not merely "by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect," because the purpose is to "protect the geographical area where the business owner conducts business, and to protect its economic interests against those who may have gained an unfair competitive advantage against them as a former employee." *O'Leary v. Telecom Res. Serv., LLC*, No. 10C-03-108-JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011). Here, the physical distance is small—15 miles from any Realogy branch in which Jongebloed "worked or had responsibilities" (in Jongebloed's case, means all of Martha Turner's branches, which are all in the Houston area)— and tied to the area where Martha Turner conducts business.[8] *See* Ex. A-7 ¶ at 2. And the scope is even narrower than what appears at first blush: Jongebloed is free to "perform services for a commercial or residential real estate brokerage business" so long as she does not perform services for a new employer that: (1) are the "same as" or "similar to" what she provided to Realogy; or (2) are "likely or probable to result in the use or disclosure of Confidential Information." *See id.*[9]

---

[7] The duration is also reasonable under Texas law. *See, e.g.*, *See Six Dimensions, Inc. v. Perficient, Inc.*, 356 F. Supp. 3d 640, 648 (S.D. Tex. 2018); *see also Merritt Hawkins & Assocs., LLC v. Gresham*, 79 F. Supp. 3d 625, 639-40 (N. D. Tex. 2015), *aff'd*, 861 F.3d 143 (5th Cir. 2017) (permitting a similar non-solicitation agreement that lasted for three years).

[8] The geographic scope is also reasonable under Texas law. *See, e.g.*, *Merritt Hawkins*, 79 F. Supp. 3d at 640 ("Texas courts generally enforce covenants that are restrictive to the geographic territory within which the bound employee worked during his employment.").

[9] The scope of activity is also reasonable because it is limited to the services Jongebloed performed and limited to the Realogy customers and employees Jongebloed interacted with in the 24 months preceding her resignation. *See* Ex. A-7 at §§ 1, 3, 5; *see also Pfuhl*, 1992 WL 345465, at *12 (enjoining former employees from dealing with customers of their former employer with whom they had contact); *Peat Marwick Main & Co. v. Haass*, 818 S.W.2d 381, 387 (Tex. 1991) (same rule under Texas law).

### iii.    Jongebloed's Covenants Advance Realogy's Legitimate Economic Interests.

Realogy has legitimate economic interests worthy of protection, which include, among other things, Realogy's goodwill, confidential and proprietary information, and other significant, invaluable aspects to Realogy's ability to continue to successfully conduct business in the area where Jongebloed was employed. *See* Aff. at ¶¶ 7, 10, 17, and 22. These interests are especially significant because the majority of Realogy's business is conducted through sales and personal contacts.  *See id.* at ¶ 7.  Delaware law considers these interests to be legitimate and worthy of protection. *See, e.g.*, *Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886, at *10 (Del. Ch.), *judgment entered* (Del. Ch. 2004) (holding as legitimate economic interests the "goodwill of [] clients," "confidential information," and preventing contacts developed by a former employee on the employer's behalf from "being used in competition against" the employer).[10] Moreover, Jongebloed stipulated that these interests of Realogy are "legitimate business interests." *See* Ex. A-7 at § 9.

Jongebloed's covenants—which reasonably limit her outright competition with Realogy and her solicitation of Realogy employees and customers—are accordingly tailored to advance Realogy's legitimate economic interests. Accordingly, this factor has been met.

### iv.    The Balance of the Equities Favors Realogy.

This factor, which overlaps with the third factor of the Fifth Circuit's test, has been met because the balance of equities favors Realogy:

---

[10] Texas law also considers these to be legitimate business interests. *See, e.g.*, *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 649 (Tex. 2006).

**Effects of Enforcing Jongebloed's Covenants**

| *As to Realogy* | *As to Jongebloed* |
| --- | --- |
| • Realogy receives the benefit of the parties' bargain<br>• Realogy's goodwill and other legitimate economic interests are protected<br>• Realogy's sales force is not raided for one year<br>• Realogy's Confidential Information is protected<br>• Realogy's relationships with its customers are protected for one year | • Jongebloed honors her promise<br>• Jongebloed can work in the industry—even for Compass—subject to limited conditions |

Here, Jongebloed stipulated that her restrictive covenants were "reasonable and necessary for the protection of the legitimate business interests of" Realogy. *See* Ex. A-7 at Preamble and § 9. She further stipulated that her restrictive covenants created "no undue hardship" for her. *See id.* And the evidence already adduced has proven that to be the case. Indeed, Compass' legal department initially agreed Jongebloed would provide services "outside the Houston metropolitan area." *See* Ex. A-11 at 2. Indeed, Realogy only filed suit after Compass and Jongebloed performed an about-face. *See* Compl. at ¶¶ 38, 39.

This case is therefore similar to *Newell Rubbermaid Co. v. Storm*, in which the Delaware Court of Chancery balanced the equities in a non-compete case and concluded there was no "undue hardship" on the defecting employee because "she [was] free to continue her employment with [a competitor], though she is being asked to honor her agreement, supported by consideration, that she not solicit Target on behalf of a competitor." No. CV 9398-VCN, 2014 WL 1266827, at *11 (Del. Ch. Mar. 27, 2014); *see also All Pro Maids*, 2004 WL 1878784, at *5 (reaching a similar conclusion). This factor has therefore been met.

29

### v.      Jongebloed Breached the RCA

Even at the pleadings stage, and even without the benefit of discovery, Realogy can show that Jongebloed breached her covenant not to compete[11] and her nondisclosure covenant.[12]

First, there is no disputing that Jongebloed is in breach of her covenant not to compete:

### Jongebloed's Covenant Not to Compete (RCA § 2)

| Jongebloed's Promises | Jongebloed's Breaches |
|---|---|
| *1.* For one year after her resignation, ***not to****: | *1.* Almost immediately began working for Compass after resigning from Realogy;[13] |
| *2.* perform services that are: | *2.* Performing services for Compass that are: |
| **a.** similar to what she performed for Realogy, ***or*** | **a.** Similar to what she performed for Realogy (Brokerage Manager for Compass; VP of Sales for Realogy);[14] ***and*** |
| **b.** likely or probable to result in the use or disclosure of Realogy's Confidential Information; | **b.** Likely or probable to result in the use or disclosure of Realogy's Confidential Information, *e.g.*, iProspect, MIS)[15]; |
| *3.* for a non-Realogy commercial or residential real estate brokerage; | *3.* For Compass—a residential real estate brokerage;[16] |
| *4.* within 15 miles of a Realogy branch in which she worked within 24 months preceding her resignation. | *4.* Just ***2.24 miles*** from a Realogy branch.[17] |

---

[11] The text of Jongebloed's covenant not to compete is contained at Ex. A-7 at § 2.

[12] The text of Jongebloed's nondisclosure covenant is contained at Ex. A-7 at § 3.

[13] *See supra* at p. 20; *see also* Compl. at ¶ 25.

[14] *See supra* at p. 21; *see also* Compl. at ¶¶ 41, 50, 51.

[15] *See supra* at p. 21; *see also* Compl. at ¶¶ 41, 51.

[16] *See supra* at p. 21; *see also* Compl. at ¶ 26 and Ex. A-3.

[17] *See* Ex. A-4; *see also* Compl. at ¶ 27; Aff ¶¶ 13, 37.  The Complaint and Affidavit state that the distance between the two offices is 3.2 miles.  That number represents the driving distance; however, 2.24 miles, as shown in Exhibit A-4, is the linear distance between the two locations.

Second, Jongebloed additionally breached her nondisclosure covenant by failing to return spiral notebooks in which she took notes during sensitive management meetings relating to Realogy's Confidential Information. *See* Ex. A-7 at § 3 ("Participant shall deliver to the Company at the termination of his or her employment ... all memoranda, notes, . . . and other documents . . . (and copies thereof) relating to the Confidential Information . . . that the Participant may then possess or have under his or her control."); *see* Aff. at ¶¶ 30, 31. There is no question that Jongebloed's notes are Realogy's property. *See* Ex. A-7 at § 4 ("The Participant recognizes that the Company . . . possess[es] a proprietary interest in all Confidential Information. . . .").

Both of Jongebloed's breaches are material and deprive Realogy of its benefit of the parties' bargain. Accordingly, this factor has been met.

### vi. Jongebloed's Breaches of the RCA have Resulted in Harm to Realogy.

Because this factor largely overlaps with the second factor of the Fifth Circuit's test, Realogy incorporates its discussion of that factor (immediately below) by reference.

### 2. Factor Two: A Substantial Threat Exists that Realogy will Suffer Irreparable Injury if the Court Does Not Issue the Requested Injunction.

In order for an injunction to be issued, "the injury need not have been inflicted when application is made or be certain to occur; a strong threat of irreparable injury before trial is an adequate basis." *United States v. Emerson*, 270 F.3d 203, 262 (5th Cir. 2001) (internal quotations and emphasis omitted).

A substantial threat exists that Realogy will suffer irreparable injury if the injunction is not issued for two principal reasons. ***First***, Delaware courts have long held that contractual stipulations of irreparable injury—as are present in the RCA—alone suffice to satisfy this element under

31

Delaware law. **Second**, Delaware courts routinely hold that the harms suffered by a non-breaching employer in the restrictive covenants context are, by their nature, irreparable.

Finally, Realogy's irreparable harm is not undermined by any alleged delay to file this Motion: this Motion is filed less than three months after the Complaint was filed, and Jongebloed has engaged in a campaign of delay through her serial motions to dismiss and baseless choice-of-law and other arguments—which required Realogy to thoroughly refute in responsive briefing and in this brief.

> **i.  Jongebloed's Stipulations Suffice to Establish Irreparable Harm.**

Delaware "courts have long held that 'contractual stipulations as to irreparable harm alone suffice to establish [the irreparable injury] element for the purpose of issuing . . . injunctive relief.'" *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1226 (Del. 2012), *as corrected* (July 12, 2012) (in a nondisclosure context) (collecting cases); *see also, e.g.*, *Newell*, 2014 WL 1266827, at *11 (in non-compete context); *Hough Assocs., Inc. v. Hill*, No. CIV.A. 2385-N, 2007 WL 148751, at *18 (Del. Ch.), *judgment entered*, (Del. Ch. 2007).

Here, Jongebloed stipulated that :

1.  "the business in which" Realogy is "engaged is ***intensely competitive***";[18]

2.  Any violation by her of the RCA "***would cause substantial injury***" to Realogy;[19]

3.  Any disclosure by her of Realogy's Confidential Information "could place [Realogy] at a ***serious competitive disadvantage*** and could do ***serious damage***, financial and otherwise, to the business of [Realogy]";[20] and

4.  Realogy "***shall be entitled to preliminary and permanent injunctive relief*** to prevent or restrain any such violation[s] . . . ***without any requirement*** that the Company . . . ***post bond***."[21]

---

[18] Ex. A-7 at Preamble (emphasis added).
[19] *Id.* at § 9 (emphasis added).
[20] *Id.* at Preamble (emphasis added).
[21] *Id.* at § 9 (emphasis added).

Considered together, Jongebloed's stipulations establish that her breaches could and would cause "substantial" and "serious" injury and damage, and that she agreed to be enjoined if she violated the RCA. Jongebloed's stipulations are substantially similar to those enforced by Delaware courts. *See, e.g.*, *Newell*, 2014 WL 12666827 at *18;[22] *Hough*, 2007 WL 148571, at *12, 18;[23] *Kan. City S. v. Grupo TMM, S.A.*, No. Civ.A. 20518-NC, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003);[24] *True N. Commc'ns Inc. v. Publicis S.A.*, 711 A.2d 34, 44 (Del. Ch. 1997).[25] Accordingly, Jongebloed's stipulations establish that the irreparable injury element has been met.

### ii.    In the Alternative, Jongebloed's Breaches Are Likely to Cause Irreparable Injury that would be Difficult to Quantify.

Even beyond Jongebloed's stipulations, the "harms resulting from competition by someone bound by a noncompetition agreement are frequently found to be irreparable" by Delaware courts. *See Tristate Courier & Carriage, Inc.*, 2004 WL 835886, at *13 n.147 (collecting cases). Among other reasons, Delaware courts find these types of harms to be irreparable because monetary damages are frequently inadequate and are difficult to calculate in the restrictive covenant context. *See, e.g.*, *Hough*, 2007 WL 148751, at *18 (acknowledging the "uncertainty about what would have happened" if non-compete were not breached, and explaining that was "precisely why our law has consistently found . . . irreparable injury . . . a covenant not to compete is breached,"

---

[22] The *Newell* court enforced the employee's stipulation that the employer would "suffer substantial damage for which there is no adequate remedy at law due to the impossibility of ascertaining exact money damages."

[23] The *Hough* court enforced a stipulation stating "money damages alone would be an inadequate remedy; that any breach by Seller of the [covenant not to compete] would cause immediate and irreparable harm to the Company; that . . . Company . . . shall have the right to equitable relief, including injunctive relief, against Seller, without posting bond."

[24] The *Kansas City* court enforced a stipulation stating "that irreparable damage would occur in the event that any of the provisions of [the] Agreement were not performed in accordance with their specific terms or were otherwise breached."

[25] The *True North* court enforced a stipulation stating that "a breach [of § 1.1] would cause a loss to True North which could not be reasonably or adequately compensated in damages in an action at law, that remedies other than injunctive relief could not fully compensate True North for a breach of said covenants and that, accordingly, True North shall be entitled to injunctive relief to prevent any breach or continuing breaches of this Agreement arising out of a request under section l.1."

because "measuring the effects of breaches like this involves a costly process of educated guesswork with no real pretense of accuracy."); *Tristate*, 2004 WL 835886, at *13 n. 147 (rejecting "the argument that an award of damages would be sufficient to remedy any tortious interference with contract" in that context because "[d]isgorgement of profits . . . would not fully account for the impact on longstanding relationships"); *Singh v. Batta Envtl. Assocs., Inc.*, No. Civ.A. 19627, 2003 WL 21309115, at *9 (Del. Ch. May 21, 2003) (holding that the "inadequacy of damages as a remedy, as well as the difficulty in calculating damages . . . constitute irreparable harm" sufficient to support an injunction); *Vitalink Pharmacy Services, Inc. v. Grancare, Inc.*, 1997 WL 458494, at *12 (Del. Ch. 1997) (awarding injunctive relief when "the Court could not measure with any reasonable degree of confidence the financial harm that [the plaintiff] would incur as a result of the Non-Competition Agreement violation.").[26]

Here, Jongebloed's violations of the RCA are likely to cause the exact harms to Realogy that Delaware courts have considered irreparable. As Jongebloed stipulated, Realogy is in a competitive service industry. *See supra* at p. 32; Aff. at ¶¶ 4-11; *Tristate*, 2004 WL 835886, at *10. Moreover, in the luxury residential real estate industry, "[p]ersonal contacts are critical to the success or failure of [a] venture." *See supra* at p. 28; Aff. at ¶ 7; *Tristate*, 2004 WL 835886, at *10; *Singh*, 2003 WL 21309115 at *8 (in a service industry, "clients often identify and develop a

---

[26] Other cases outside of the restrictive covenant context are in accord. *See, e.g.*, *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000) ("[W]here money damages 'may be highly difficult to calculate' preliminary injunctive relief is proper."); *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 586 (Del. Ch. 1998) ("Preliminary injunctive relief may be appropriate when plaintiff's damages are difficult or impossible to quantify.").

Texas law is similarly in accord. *See, e.g.*, *Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 569 (S.D. Tex. 2014) ("injury resulting from the breach of non-compete covenants is the epitome of irreparable injury."); *Traders Int'l, Ltd. v. Scheuermann*, Civ.A. No. H-06-1632, 2006 WL 2521336, at *9 (S.D. Tex. Aug. 30, 2006) (irreparable injury present where a former employee, with knowledge of confidential information, in addition to trade secrets, took a similar job working for a competitor); *TransPerfect Translations, Inc. v. Leslie*, 594 F. Supp. 2d 742, 757 (S.D. Tex. 2009).

loyalty to the particular employee who provides the services, rather than the employer."). As Jongebloed stipulated, Realogy provided her "access to . . . [Realogy's] customers" and she "developed relationships with . . . [Realogy's] customers . . . at the time and expense of [Realogy]." Ex. A-7 at Preamble.

Realogy's harms, therefore, consist of "the loss (or foreseeable loss) of client goodwill," the "suffering of the use of client connections against" Realogy, and Jongebloed's possession of Realogy's Confidential Information—all of which are irreparable injuries under Delaware law. *Tristate*, 2004 WL 835886, at *10, *12 ("Here, there are two related concerns. One is the solicitation of TriState's customers; the other is TriState's loss of business from those customers. TriState contracted with McGivney for a specific right—the right to deal with its customers without the fear of McGivney's use of relationships developed as a TriState officer and employee to aid its competitors. In substance, it contracted, for a period of limited duration, for a defense of the good will of its clients."); *see also Singh*, 2003 WL 21309115 at *9 (concluding irreparable harm existed where: (a) the employer was in a "service industry," (b) "clients often identify and develop a loyalty to the particular employee who provides the services, rather than the employer," (c) the former employee "developed a personal relationship with certain . . . clients while employed at that firm," and (d) the diverted clients had not done business with the employer since that time); *Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, No. Civ.A. 1518-N, 2006 WL 2337592, at *20 (Del. Ch. Aug. 4, 2006) ("Damages would not adequately compensate Plaintiffs for a breach of the confidentiality provisions because the purpose of such provisions is to prevent harm and misuse before it occurs.").

Finally, given the nature of the harms, it would be difficult, if not impossible, to adequately calculate the harm in terms of monetary damages without engaging in the type of "educated

guesswork" the Delaware courts correctly concluded would occur in the restrictive covenant context. *See, e.g.*, *Hough*, 2007 WL 148751, at *18 ("measuring the effects of breaches like this involves a costly process of educated guesswork with no real pretense of accuracy."). Realogy will have no readily quantifiable way to determine to what extent any business or relationship that is lost, not acquired, or soured is the result of honest competition or the unfair competition resulting from Jongebloed's wrongful use of Realogy's Confidential Information. Once Jongebloed shares, uses or passes on the confidential information she obtained while with Realogy, the value of that information by virtue of it being confidential will be lost. In other words, the use and disclosure of Realogy's Confidential Information will diminish the value of such information and damage Realogy in an amount that cannot readily be quantified. *Sprint Corp.*, 2006 WL 2337592, at *20 ("Damages would not adequately compensate Plaintiffs for a breach of the confidentiality provisions because the purpose of such provisions is to prevent harm and misuse before it occurs.").[27]

       **iii.**    **Realogy's Irreparable Harm is Not Undermined by any Alleged Delay, which, in Any Case, Was Caused by Jongebloed's Baseless Motion Practice.**

Finally, Jongebloed cannot argue that any alleged delay in bringing this Motion undermines a finding of irreparable harm, for two reasons. ***First***, this Motion is filed less than three months from the date the Complaint was filed (March 21, 2019), and any alleged delay is insubstantial. *See, e.g.*, *Ocusoft, Inc. v. Walgreen Co.*, No. CV H-17-1037, 2017 WL 1838106, at *3 (S.D. Tex. May 8, 2017) (stating that a "two-to-three month delay in seeking a TRO does not foreclose injunctive relief"); *Solofill, LLC v. Rivera*, No. CV H-16-2702, 2017 WL 514589, at *4 (S.D. Tex.

---

[27] *See also Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) ("In general, a harm is irreparable where there is no adequate remedy at law, such as monetary damages.").

Feb. 8, 2017) (collecting cases of seven-, eight-, and nine-months of delay). Since that time, the parties have explored possible out-of-court resolutions. And it cannot be forgotten that Jongebloed and Compass initially agreed that Jongebloed would be placed on leave—only to renege and prompt this litigation. Moreover, despite those discussions, Realogy has diligently prosecuted this case.

*Second*, any delay was caused by Jongebloed's pattern of raising—in a serial fashion— baseless but time-consuming motions to dismiss. Specifically, Jongebloed filed her first motion to dismiss—under Federal Rule of Civil Procedure 12(b)(6)—on April 19, 2019. *See* Doc. 7. In that first motion, Jongebloed sought dismissal on the basis of an affirmative defense that required the Court to (1) override the parties' choice of Delaware law and (2) make an unwarranted *Erie* leap that the Supreme Court of Texas would hold that restricted stock units could not suffice as consideration for restrictive covenants. Despite those extraordinary requests, Jongebloed's three-page, combined motion and brief failed to apply the required choice-of-law analysis and failed to brief the *Erie* question. And after Realogy was forced to thoroughly refute Jongebloed's first motion, she failed to file any reply whatsoever. *See* Doc. 12.

Yet before Realogy filed its response to Jongebloed's first motion to dismiss, on May 22, 2019, she filed a ***second*** motion to dismiss, this time under the Texas Citizens Participation Act. *See* Doc. 10. Her second motion was similarly conclusory and similarly depended on the Court overriding the parties choice of law. Despite that dependence, however, Jongebloed simply recycled the same choice-of-law analysis. And like her first motion, her second motion similarly requested an unwarranted *Erie* leap that the Supreme Court of Texas would consider her breaching her covenant not to compete and nondisclosure agreement to be an alleged exercise of First Amendment rights. Yet—even though the Court should conclude the Texas statute does not apply

to this case due to, a minimum, the parties' choice of Delaware substantive law—the statute's pleadings-stage dismissal process nevertheless required Realogy to brief the issues and provide clear and convincing evidence of a prima facie case of Jongebloed's breach of contract. *See* Docs. 15-16.

Accordingly, good reasons exist for any alleged delay of less than three months. Jongebloed was not prejudiced by the relatively short span of time between the filing of this Motion and the Complaint. See, e.g., *Ocusoft, Inc.*, 2017 WL 1838106, at *3; *Solofill, LLC*, 2017 WL 514589, at *4. Any alleged delay should therefore not undermine a finding of irreparable harm.

### 3. Factor Three: The Threatened Injury to Realogy Outweighs a Potential Injury Posed by the Requested Injunction to Jongebloed.

The threatened injury to Realogy—the credible threat of a loss of its goodwill, sales force and other employees, and customers—greatly outweighs any injury posed by the injunction to Jongebloed, who would merely be held to her agreement, and Realogy incorporates its discussion of the balancing of the equities by reference. *See supra* at § III(B)(1)(iv). This factor has therefore been met.

### 4. Factor Four: Granting the Requested Injunction Will Not Disserve the Public Interest.

In a decision affirmed by the Fifth Circuit, this Court has previously—and correctly—noted that covenants not to compete actually serve the interests of employers, employees, and the public:

> Covenants not to compete encourage business growth by protecting the employer's investment in human capital. Reciprocally, they allow workers to acquire training and experience that improve their value to employers— current and future. When they have a reasonable scope, they do not impose disproportionate limits on the employee or public, and the consequences are increased productivity for both parties and their economy.

*Kenyon Int'l Emergency Servs., Inc. v. Malcolm*, No. CIV.A H-09-3550, 2010 WL 452745, at *3 (S.D. Tex. Feb. 8, 2010), *aff'd*, 400 F. App'x 893 (5th Cir. 2010) (internal citations omitted). This Court's public policy analysis is in accord with decisions by Delaware courts. *See, e.g.*, *Hough*, 2007 WL 148751, at *18 (concluding the "public policy of [Delaware] permits parties to . . . agree[] that breaches of their contracts will create irreparable harm and should be remedied by injunctive relief."); *Tristate*, 2004 WL 835886, at *15 ("Nonetheless, the public interest in competition does not outweigh the purposes served by a covenant not to compete in this context."). Enforcing Jongebloed's restrictive covenants—especially as limited and tailored as they are— would only promote legitimate competition—not disserve any public interest. This factor is therefore met.

### C.    The Amount of a Bond, if Any, Should be Minimal.

As explained above, any harm to Jongebloed for being ordered to perform her promises is minimal, Jongebloed stipulated that Realogy would not be required to post a bond, and Jongebloed is wrongfully retaining ***Realogy's*** property.. In any event, if the Court were to require Realogy to post a bond, it should not be any more than $5,000.

### IV.    Discovery and Protective Order

Realogy respectfully requests, under Federal Rule of Civil Procedure 26(d)(1), permission to conduct targeted discovery on an expedited basis, *e.g.*, a deposition of Jongebloed and a deposition of the corporate representative(s) of Compass RE Texas, LLC, and requests for production, in connection with Realogy's request for a preliminary injunction, or alternatively (and

to the extent the statute applies to this case), Realogy's response to Jongebloed's motion to dismiss under the Texas Citizens Participation Act.

Moreover, Realogy further requests that the Court enter a protective order containing attorney's-eyes-only protection in connection with the requested discovery and/or in advance of the preliminary injunction, so Realogy can file and exchange exhibits relating to its Confidential Information and trade secrets and keep such information protected from public dissemination.

## V.    Conclusion and Injunctive Relief Sought

For the foregoing reasons, Realogy requests a Preliminary and Permanent Injunction against Jongebloed, her agents, servants, representatives, employer, attorneys, and those persons in active concert or participation with Jongebloed who receive actual notice of the Court's injunctions by personal service or otherwise in the following respects:

a. Enjoining Jongebloed, for one year from the date the Court's injunction is issued,[28] from directly or indirectly (a) performing services that are the same as or similar to the services Jongebloed provided to Realogy or its Affiliates[29] during the 24 months prior to February 1, 2019, (b) within 15 miles of any branch of Martha Turner Sotheby's International Realty® ("**Martha Turner**"), (c) for Compass RE Texas, LLC ("**Compass**") or any other commercial or residential real estate brokerage business.

b. Enjoining Jongebloed, for one year from the date the Court's injunction is issued, from directly or indirectly (a) performing services that are otherwise likely or probable to result in the use or disclosure of Confidential Information,[30] (b) within 15 miles of any branch of Martha Turner (c) for Compass or any other commercial or residential real estate brokerage business.

c. Enjoining Jongebloed, for one year from the date the Court's injunction is issued, from directly or indirectly (a) soliciting or engaging in any business that is competitive with the business engaged in by Realogy and its Affiliates as of February 1, 2019 (b) with Covered Clients or Prospects.[31]

---

[28] Again, Jongebloed agreed to extend the duration of certain of her restrictive covenants so Realogy would not be deprived by Jongebloed's breaches of the benefits of the full one-year periods of those covenants. *See* Ex. A-7 at § 9.

[29] "Affiliates" has the meaning ascribed to it in the RCA. *See* Ex. A-7 at § 10(a)(1).

[30] "Confidential Information" has the meaning ascribed to it in the RCA. *See id.* at § 10(b).

[31] "Covered Client or Prospect" has the meaning ascribed to it in the RCA. *See id.* at § 1.

d.  Enjoining Jongebloed, for one year from the date the Court's injunction is issued, from directly or indirectly taking away, soliciting, or diverting business of Covered Clients or Prospects from Realogy or its Affiliates.

e.  Enjoining Jongebloed, for one year from the date the Court's injunction is issued, from directly or indirectly interfering in the business relationships between Realogy or its Affiliates and Covered Clients or Prospects.

f.  Enjoining Jongebloed, for one year from the date the Court's injunction is issued, from directly or indirectly assisting or attempting to assist any person, firm or entity soliciting or diverting Covered Clients or Prospects.

g.  Enjoining Jongebloed, for one year from the date the Court's injunction is issued, from directly or indirectly (a) soliciting or inducing, or attempting to solicit or induce, (b) any employee, independent contractor, sales agent or sales associate of Realogy or its Affiliates who were employed by or associated with Realogy or its Affiliates during the 24 months preceding February 1, 2019 and either (1) worked in an office/department that Jongebloed managed, oversaw or with whom Jongebloed otherwise worked during her employment by Martha Turner or (2) Jongebloed possessed or obtained Confidential Information regarding (d) to leave Realogy or its Affiliates for any reason whatsoever.

h.  Enjoining Jongebloed, for one year from the date the Court's injunction is issued, from directly or indirectly (a) hiring, soliciting to hire, or in any other manner interfering with the business relationship between Realogy or its Affiliates and (b) any employee, independent contractor, sales agent or sales associate of Realogy or its Affiliates who were employed by or associated with Realogy or its Affiliates during the 24 months preceding February 1, 2019 and either (1) worked in an office/department that Jongebloed managed, oversaw or with whom Jongebloed otherwise worked during her employment by Martha Turner or (2) Jongebloed possessed or obtained Confidential Information regarding.

i.  From using or disclosing Confidential Information of which Jongebloed is or becomes aware, whether or not such information is developed by her.

j.  From failing to deliver to Realogy all memoranda, notes, plans, records, reports, computer tapes and software and other documents and data (and copies thereof) relating to the Confidential Information or the Work Product[32] of the business of Realogy or any of its Affiliates that Jongebloed may possess or have under her control, including:

    i.  Information regarding the preferences, financial information, historical information or compilations of any non-public information specific to Realogy, Martha Turner or their Affiliates' customers, agents and employees;

---

[32] "Work Product" has the meaning ascribed to it in the RCA. *See id.* at § 3.

ii.   Information regarding the preferences, financial information, historical information or compilations of any non-public information specific to Realogy, Martha Turner or their Affiliates' prospective customers, agents and employees;

iii.   Non-public financial information regarding Realogy, Martha Turner or their Affiliates;

iv.   Identity of the agents Realogy, Martha Turner and their Affiliates want to retain and related information on why, how and what methods are used to retain agents;

v.   Identity of prospective agents Realogy, Martha Turner and their Affiliates want to target and related information on why, how and what methods are used to target prospective agents;

vi.   Information regarding the preferences, habits, requirements, financial requests, or any other non-public information specific to customers, agents and employees of Realogy, Martha Turner or their Affiliates;

vii.   Realogy, Martha Turner and their Affiliates' methods of operation;

viii.   Realogy, Martha Turner and their Affiliates' current and past personnel data;

ix.   Realogy, Martha Turner and their Affiliates' current and future business plans;

x.   Realogy, Martha Turner and their Affiliates' current and future advertising or marketing plans;

xi.   Information obtained through or learned as a result of using iProspect, MIS, or any other proprietary database or software of Realogy, Martha Turner or their Affiliates;

xii.   Information regarding the technology, processes, procedures and software used to develop business by Realogy, Martha Turner or their Affiliates and the manner in which the technology, processes, procedures and software are used by Realogy, Martha Turner, and their Affiliates, including proprietary designs;

xiii.   Information regarding the sales tactics used by Realogy, Martha Turner and/or their Affiliates; and

xiv.   Analyses, notes, and internally-created reports regarding the performance, salaries, commissions, and other non-public information regarding Realogy, Martha Turner or their Affiliates' agents.

Realogy further requests that the Court grant it such further relief to which it may be entitled in law and equity.

Date: June 14, 2019

Respectfully submitted,

HOLLAND & KNIGHT LLP

*/s/ Mary Goodrich Nix*
Mary Goodrich Nix
Attorney-in-Charge
Texas Bar No. 24002694
Mary.Nix@hklaw.com
Nicholas A. Sarokhanian
Texas Bar No. 24075020
Nicholas.Sarokhanian@hklaw.com
Lauren R. Becker
Texas Bar No. 24106638
Lauren.Becker@hklaw.com
200 Crescent Court, Ste. 1600
Dallas, TX 75201
214-964-9407 – Telephone
214-964-9501 – Facsimile

Jason Huebinger
Texas Bar No. 24065460
1100 Louisiana Street, Ste. 4300
Houston, TX 77002
(713) 244-6873 – Telephone
Jason.Huebinger@hklaw.com

**ATTORNEYS FOR PLAINTIFF
REALOGY HOLDINGS CORP.**

## CERTIFICATE OF SERVICE

On June 14, 2019, I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Nicholas A. Sarokhanian*
Nicholas A. Sarokhanian